IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| KIMBERLY GASTON,<br>Plaintiff,<br><br>v.<br><br>COMMISSIONER OF SOCIAL SECURITY,<br>Defendant. | Case No. 20–CV–00497–JPG |

**MEMORANDUM & ORDER**

This is a Social Security Disability appeal. Before the Court is Plaintiff-Appellant Kimberly Gaston's Brief. (ECF No. 19). Defendant-Appellee Commissioner of Social Security responded. (ECF No. 24). For the reasons below, the Court **AFFIRMS** the Commissioner's denial of benefits and **DIRECTS** the Clerk of Court to **ENTER JUDGMENT**.

**I.   PROCEDURAL & FACTUAL HISTORY**

Gaston applied for Social Security benefits in 2017, (Tr. of Administrative R. [*hereinafter* "Tr."] at 169, ECF No. 17), alleging an onset date of March 10, 2015, (*id.* at 179). In brief, she contends that she is unable to maintain gainful employment because she has "degenerative disc disease, lumbar stenosis, lumbar spondylosis[,] lumbago with left side sciatica[,] . . . nerve root impingement, positive straight leg raise testing, chronic pain[,] extreme weakness and difficulty ambulating without the use of an assistive device," and obesity. (*Id.* at 166).

In 2019, Gaston appeared before an administrative law judge ("ALJ") with the Social Security Administration and provided testimony to support her application. (*Id.* at 35). Her most recent job was at Kauffman Engineering for four years, until 2015. (*Id.* at 43, 49). For the first two years, she was "[j]ust a worker": "you got these big boards and you have different wires, and they're usually color coded and they've got terminals on each end, and you have to plug them into

housings . . . ." (*Id.* at 45). The job required standing and heavy lifting for most of the workday. (*Id.*). But for the next two years, Gaston was promoted to assistant team leader and was "setting up the jobs . . . instead of doing them . . . ." (*Id.* at 46). She also did "a lot of shipping," (*id.*), meaning she would put "parts into a box, and then print out labels and put labels on them, and then carry them back to shipping," (*id.* at 47). She had to regularly lift "pretty close to 40 pounds . . . ." (*Id.*). Gaston ultimately stopped working in 2015 because "[t]he standing was getting to [her]," as was the lifting. (*Id.* at 49–50).

Ultimately, the ALJ denied Best's application for Supplemental Social Security Income. (*Id.* at 62). The decision followed the typical "five-step sequential evaluation process" used by the Social Security Administration "for determining whether an individual is disabled." (*Id.* at 66). *See* 20 C.F.R. § 404.1520(a)(4).

At Step One, the ALJ determined that Gaston has "not engaged in substantial gainful activity since March 10, 2015, the amended alleged onset date." (Tr. at 19).

At Step Two, the ALJ determined that Gaston suffers from "the following severe impairments: degenerative disc disease at the lumbar spine with sciatica and obesity." (*Id.*). That said, her other claimed impairments—restless leg syndrome, hypertension, high blood pressure, Type II diabetes, iron and vitamin D deficiency, high cholesterol, and "aching right shoulder pain"—either had only "a minimal effect on [her] ability to meet the demands of work activity" or were not medically determinable. (*Id.* at 19–21).

At Step Three, the ALJ determined that Gaston's severe impairments did not, singly or in combination, meet the requirements of a "Listed Impairment" in the Code of Federal Regulations. (*Id.* at 21–22). In other words, he concluded that Gaston is not "presumptively disabled." (*Id.*).

Before moving to Step Four, the ALJ evaluated Gaston's residual functional capacity ("RFC"), which assessed the limitations imposed by Gaston's severe impairments on her ability to perform gainful work. (*Id.* at 22). He began by recounting Gaston's work experience at Kauffman Engineering and noted that Gaston left "because she was no longer able to perform her job duties because of the condition of her back and legs." (*Id.* at 23). To that end, the ALJ also acknowledged that Gaston "suffers chronic pain in the back that radiates down into her buttocks and left leg." (*Id.*). The back pain had lasted about 10 years, and the radiating pain in her leg—known as sciatica—had lasted about three. (*Id.*). The ALJ then noted Gaston's subjective impressions: Gaston said that her pain was usually around a seven out of ten, which worsened while walking or standing for long periods; that "[s]he uses a cane that he doctor recommended . . . every time she leaves the house"; that "she can stand and sit, each, for about 20 minutes at time"; "that she could not perform a job that allowed for alternating between sitting and standing because she needs to move constantly to find a comfortable position"; that she has to lie down "about every afternoon for 2 to 3 hours"; and that the most she can lift or carry is "about 8 to 10 pounds." (*Id.*; *see also id.* at 53, 59–61).

After reviewing Gaston's subjective impressions, the ALJ turned to the objective record. He noted that health records from 2014 reflected that Gaston reported lower back pain that was aggravated by her daily activities, but "[s]he denied any radiating symptoms." (*Id.* at 23) (citing *id.* at 290). An MRI taken of Gaston's lumbar spine in 2016 confirmed that Gaston indeed had "a mild annular disc bulge at L2-L3 through L5-S1 along with mild to moderate spinal stenosis from L2-L3 to L4-L5"; "a small left lateral extraforaminal disc protrusion at L3-L4 abutting the existing left L3 nerve root"; "a small foraminal disc protrusion at L4-L5 impinging on the L5 nerve root and abutting the L4 nerve root"; "bilateral neural foraminal stenosis from L2-L3 to L4-L5"; and

"moderate lumbar spondylosis at L5-S2 and slight retrolisthesis at L2-L3." (*Id.*) (citing *id.* at 347, 505). These findings were recounted by Dr. Ketan Vyas upon examining Gaston in 2017, but he noted that Gaston "had only mild difficulty getting on and off the examination table" and that her range of motion throughout her body was normal. (*Id.* at 24) (citing *id*. at 485–86). Dr. Vyas also observed that Gaston "could walk without" a cane, that her "motor strength and sensation were intact," and that "her senses were present, equal, and symmetrical." (*Id.*) (citing *id.* at 486).

The ALJ then discussed Gaston's 2017 examination by Pamela Miller, a nurse practitioner who examined Gaston before refilling her pain medication. (*Id.*). Nurse Miller noted that Gaston's "overall condition was good"; that she was "in no acute distress"; and had " 'normal, full range of motion [and] strength.' " (*Id.*) (quoting *id.* at 493–94).

Finally, the ALJ examined the treatment records of Dr. Thomas Selby, who first saw Gaston in 2018. (*Id.*) (citing *id.* at 506). Dr. Selby noted that Gaston "complained of aching in the low back and right hip with right-sided sciatica," and that Gaston "had not been in physical therapy for her back for about 10 years." (*Id.*) (citing *id.* at 506). On examination, Dr. Selby acknowledged that Gaston experienced "mild tenderness to palpation in the paraspinal musculature of the low back" but otherwise had "a normal gait . . . and normal strength in the bilateral lower extremities." (*Id.*) (citing *id.* at 509). Dr. Selby also explained to Gaston that "he did not prescribe long-term opiates because he believed [there] were 'better, safer, more proven options for chronic pain management.' " (*Id.*) (citing *id.* at 511). So despite Gaston's "long-term use of" Tramadol,[1] (*id.*) (citing *id.* at 510), Dr. Selby insisted that Gaston "work toward eliminating Tramadol from her medication regimen," (*id.*) (citing *id.* at 511). The ALJ also noted that Gaston later reported slight

---

[1] Tramadol is "a drug intended for use in relief moderate to severe pain." *Tramadol*, Attorney's Dictionary of Medicine (2020). It "has the potential to cause physical and psychological dependence." *Tramadol, Adverse Effect Of*, Attorney's Dictionary of Medicine (2020).

improvement after attending physical therapy, (*id.*) (citing *id.* at 559), yet she still sought treatment from Fairfield Pain Management, (*id.*). In any event Dr. Selby found after two separate examinations in 2018 that the condition of Gaston's musculoskeletal system was "entirely normal." (*Id.*) (citing *id*. at 538, 556).

Having reviewed Gaston's subjective impressions alongside the medical records, the ALJ weighed the opinion evidence. He started with Nurse Miller, who—in 2014—"placed a 10-pound lifting restriction on" Gaston given her severe impairments. (*Id.* at 25) (citing *id.* at 306). The ALJ found Nurse Miller's opinion to be "persuasive" and agreed then the 10-pound lifting restriction to be "a reasonable limitation . . . ." (*Id.*). The ALJ also recognized that Gaston was examined by Nurse Miller around the time that she stopped working at Kauffman Engineering "precisely because of such problems." (*Id.*). He therefore agreed that Gaston "should be limited to work activities at the sedentary exertional level." (*Id.*).

Next, the ALJ considered the opinion of Dr. Charles Kenney, who "reviewed the record for the Disability Determinations Service" in July 2017 and "found that [Gaston] could occasionally lift/carry 20 pounds and frequently lift/carry 10 pounds"; that "[s]he could stand/walk and sit, each, for about 6 hours out of an 8-hour workday"; that she "could occasionally climb ladders, ropes, and scaffolds" and "could frequently stoop, crouch, and crawl"; and that she had "no environmental limitations." (*Id.*) (citing *id.* at 75). The ALJ gave this opinion less weight because Dr. Mandala—who examined Gaston three months later—"found some greater postural limitations." (*Id.*) (citing *id.* at 86). More specifically, the ALJ agreed that Dr. Mandala's suggestion that Gaston could never climb "ladders, ropes and scaffolds" and "needed to avoid concentrated exposure to hazards" was "reasonable in light of the record as a whole," including the medical evidence showing "some instability and sciatica." (*Id.*) (citing *id.* at 87–88). Even so,

the ALJ found that Gaston has "*greater* exertional limits than those articulated by Dr. Madala. For example, [Gaston] occasionally uses a cane to address some gait problems" and "at times complains of ongoing low back pain and radicular symptoms." (*Id.*) (emphasis added). The ALJ therefore concluded that Gaston was limited to sedentary work that does not "require using foot controls." (*Id.*).

Finally, the ALJ evaluated Dr. Selby's opinion, which he found "most unpersuasive." (*Id.* at 26). The ALJ was particularly skeptical of a questionnaire Dr. Selby prepared in February 2019 that lacked narrative responses and contained—in the ALJ's view—several inconsistencies. (*Id.* at 25–26). As discussed, Dr. Selby found on several occasions that Gaston's musculoskeletal system was normal. Yet Dr. Selby seemingly changed course in preparing the questionnaire, asserting for the first time that Gaston "would be 'off task' for 25% or more of a regular workday because of her condition." (*Id.* at 25) (citing *id.* at 566). He also asserted that Gaston "could life and carry, **constantly**, less than 10 pounds," but "[s]he could **never** lift 10 pounds or more." (*Id.* at 26) (emphasis added) (citing *id.* at 566). The ALJ found that inconsistent based on the improbability that Gaston could lift, for example, nine pounds constantly yet could never lift 10. (*Id.* at 26). More importantly, Dr. Selby "provided no supportive narrative to any of his restrictions." (*Id.*). Rather, the ALJ noted that Gaston testified how "she was present went Dr. Selby completed the form," (*id.*); and Dr. Selby himself "noted that he filled out the paperwork 'with the assistance of Gaston's information," (*id.*) (citing *id.* at 516). For further support, the ALJ recognized that Dr. Selby "indicated that [*Gaston*] noted that these problems limit her ability to 'walk, lift, sit for any significant amounts/periods of time.' " (*Id.*) (emphasis in original) (citing *id.* at 516). The ALJ therefore gave Dr. Selby's opinion less weight.

With all that said, the ALJ found that Gaston's "statements concerning the intensity, persistence and limiting effects" of her severe impairments were inconsistent "with the medical evidence and other evidence in the record . . . ." (*Id.*). The ALJ noted that Gaston told Dr. Selby that she preferred to " 'stick to medications' " and get treated by Fairfield Pain Management " 'because she is interested in getting disability and needs their assessment.' " (*Id.* at 27) (citing *id.* at 563). The ALJ concluded that these statements—"[w]hile certainly not dispositive"—"call into question the earnestness upon which [Gaston] was seeking pain management and treatment." (*Id.*).

In sum, the ALJ concluded that Gaston has the following RFC:

> After careful consideration of the entire record, the undersigned finds that [Gaston] has the residual functional capacity to perform sedentary work . . . except she can occasionally climb ramps and stairs but never climb ladders, ropes, or scaffolds. [She] can frequently stoop, kneel, crouch, and crawl. She can ambulate with use of one cane and is able to maintain balance while using her unoccupied upper extremity to lift and carry items. [She] must avoid unprotected elevations and dangerous moving machinery. She can perform no job that requires the use of foot controls.

(*Id.* at 22). The ALJ also noted that he "factored [Gaston's] obesity into her [RFC]." (*Id.*).

At Step Four, the ALJ determined that given Gaston's RFC, she cannot "perform any past relevant work." (*Id.* at 27).

At Step Five, however, the ALJ determined that Gaston's severe impairments do not preclude her from *all* work. (*Id.* at 28). Rather, the ALJ concluded that Gaston can still take on sedentary positions as a document preparer, a call-out operator, or a semiconductor bonder." (*Id.*). As a result, the ALJ found that Gaston is not disabled. (*Id.* at 29).

Gaston appealed to this Court under 42 U.S.C. § 405(g), which authorizes judicial review of the Social Security Administration's denial of benefits. She argues that the ALJ erred in three ways: (1) "The ALJ erred in evaluating the opinion evidence," (Gaston's Brief at 7–11); (2) "The

ALJ rendered an erroneous subjective symptom analysis," (*id.* at 11–16); and (3) "Gaston's obesity was never discussed after the RFC finding violating SSR 02-1p," (*id.* at 16–17).

## II.  LAW & ANALYSIS

In reviewing the Social Security Administration's benefits decisions, the Court treats its findings as conclusive "so long as they are supported by 'substantial evidence.' " *Beistek v. Berryhill*, 139 S. Ct. 1148, 1152 (2019) (citing 42 U.S.C. § 405(g)). A decision is supported by substantial evidence if it contains sufficient evidence to support its factual determinations. *See Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938). Put differently, *substantial evidence* means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971). This is a very deferential standard of review. *Elder v. Astrue*, 529 F.3d 408, 413 (7th Cir. 2008). "It is the responsibility of the ALJ, not the reviewing court, to resolve conflicting evidence and to make credibility determinations." *Brewer v. Chater*, 103 F.3d 1384 (7th Cir. 1997). The Court must only determine "whether the ALJ built an 'accurate and logical bridge' from the evidence to her conclusion that the claimant is not disabled." *Simila v. Astrue*, 573 F.3d 503, 513 (7th Cir. 2009) (quoting *Craft v. Astrue*, 539 F.3d 668, 673 (7th Cir. 2008)).

### A.  ALJ's Evaluation of the Opinion Evidence

In reviewing an application for Social Security benefits, the ALJ must give a treating physician's opinion controlling weight where these two conditions are met: (1) the opinion is supported by "medically acceptable clinical and laboratory diagnostic techniques"; and (2) it is "not inconsistent" with substantial evidence on the record. 20 C.F.R. § 404.1527(c)(2). A treating physician's opinion may also carry less weight "if it is inconsistent with the opinion of a consulting physician or when the treating physician's opinion is internally inconsistent, as long as he

minimally articulate[s] his reasons for crediting or rejecting evidence of disability." *Skarbek v. Barnhart*, 390 F.3d 500, 503 (7th Cir. 2004) (cleaned up). Ultimately, the Court must "uphold all but the most patently erroneous reasons for discounting a treating physician's assessment." *Stepp v. Colvin*, 795 F.3d 711, 718 (7th Cir. 2015) (cleaned up). And an ALJ's determination is only patently wrong and deserving of reversal when it "lacks *any* explanation or support . . . ." *Elder*, 529 F.3d at 413–14 (emphasis added). "As a general rule, reviewing courts will not interfere with the Commissioner's resolution of conflicting evidence." Harvey L. McCormick, 2 Soc. Sec. Claims & Proc. § 14:9 (6th ed. 2019).

ALJs should consider five factors when determining the weight of a treating physician's opinion: (1) the length, nature, and extent of the treatment relationship; (2) the frequency of examination; (3) the physician's specialty; (4) the types of tests performed; and (5) the consistency and supportability of the physician's opinion. *Moss v. Astrue*, 555 F.3d 556, 561 (7th Cir. 2009) (citing 20 C.F.R. § 404.1527(c)(2)). But the ALJ need not explicitly weigh each factor in discussing a treating physician's opinion: It is enough that his decision makes clear that he was aware of and considered many of them. *See Schreiber v. Colvin*, 519 F. App'x 951, 959–60 (7th Cir. 2013).

Gaston argues that the ALJ erred by not giving controlling weight to Dr. Selby's opinion. First, she says that the ALJ did not consider the fact that Dr. Selby "or his nurse practitioner personal saw Gaston seven different times before completing the questionnaire . . . ." (Gaston's Brief at 7). She also challenges the ALJ's claim that Dr. Selby's questionnaire was internally inconsistent. (*Id.* at 8). For example, she says that it was not inconsistent for Dr. Selby to conclude that Gaston could sit for one hour at a time but for only two hours total in a workday because "[t]he ALJ decision improperly assumes Gaston could complete an eight-hour workday." (*Id.*). She also

says the ALJ's conclusion that Dr. Selby filled out the questionnaire based on the information Gaston provided "is not accurate." (*Id.* at 9). For support, she points a progress report where Dr. Selby said, "[Gaston] notes continued low back pain that has minimal to moderate response with current medication, continued paresthesia[] and sciatica symptoms on the left." (*Id.*) (citing *id.* at 516). That report also acknowledged Gaston's 2016 MRI showing mild-to-moderate stenosis. (*Id.*) (citing *id.* at 516). Put differently, Gaston contends that the ALJ erred by concluding that Dr. Selby improperly relied on Gaston's subjective impressions when completing the questionnaire. The Court disagrees.

The ALJ's decision to discount Dr. Selby's opinion was proper. For one, the Court agrees that the questionnaire contained inconsistencies, most notably concerning Gaston's lifting ability. The ALJ found it odd that Dr. Selby concluded that Gaston can *constantly* lift nine pounds without a problem yet could *never* lift 10. Contrast that with Dr. Kenney's opinion that Gaston can occasionally lift 20 pounds and frequently lift 10 pounds: The difference is in Dr. Selby's all-or-nothing response without providing any justification. In fact, his questionnaire included no narrative at all. And while Gaston claims that the ALJ did not consider how long Dr. Selby treated her, that is not so—rather, the ALJ noted that Dr. Selby's previous examinations found on several occasions that Gaston's musculoskeletal system was normal. Perhaps more importantly, the ALJ reasonably concluded that Dr. Selby improperly relied on Gaston's subjective impressions while preparing the questionnaire. Indeed, the exact language cited by Gaston in her brief supports that conclusion: "**[Gaston] notes** continued low back pain that has minimal to moderate response with current medication, continued paresthesia[] and sciatica symptoms on the left." (Gaston's Brief at 9) (emphasis added) (citing *id.* at 516). The ALJ provided more evidence: Gaston testified how

"she was present went Dr. Selby completed the form," (Tr. at 26) (*see id.* at 57);[2] and Dr. Selby himself "noted that he filled out the paperwork 'with the assistance of Gaston's information," (*id.*) (citing *id.* at 516). The ALJ also recognized that Dr. Selby "indicated that [*Gaston*] noted that these problems limit her ability to 'walk, lift, sit for any significant amounts/periods of time.' " (*Id.*) (emphasis in original) (citing *id.* at 516). Finally, Gaston's reliance on *Suide v. Astrue*, 371 Fed. App'x 684 (7th Cir. 2010), is misplaced. That case involved an ALJ who, after rejecting a treating physician's testimony, relief on evidence that pre-dated the claimant's "second stroke and more injuries from a fall—two events that may have changed [her] condition significantly." *Id.* at 690. That is hardly the situation here—though the ALJ found Dr. Selby's opinion "most unpersuasive," the RFC assessment was still consistent with the medical opinions and incorporated appropriate restrictions, like limiting Gaston to sedentary work that does not involve the use of foot petals. And unlike in *Suide*, there was no intervening event here that might cast doubt on the accuracy of the other medical opinions. All in all, the ALJ's decision to discount Dr. Selby's opinion was not patently wrong and was adequately supported.

### B. ALJ's Evaluation of Gaston's Subjective Impressions

"[B]ecause the ALJ is in the best position to determine a witness's truthfulness and forthrightness," *Stepp v. Colvin*, 795 F.3d 711, 720 (7th Cr. 2015), the Court may "overturn an ALJ's decision to discredit a claimant's alleged symptoms only if the decision is 'patently wrong,' meaning it lacks explanation or support," *Cullinan v. Berryhill*, 878 F.3d 598, 604 (7th. Cir. 2017). An ALJ is therefore " 'free to discount the applicant's testimony on the basis of the other evidence

---

[2] Q. He filled out a form for you?
A. Yes.
Q. Were you there when he filled it out?
A. I went in for an appointment and he had it there, and was filling it out, then, yes.
Q. And how did he fill it out?
A. He just asked me questions, I answered, and as far as I know he filled them out.

in the case' as '[a]pplicants for disability benefits have an incentive to exaggerate their symptoms.'" *Stepp*, 895 F.3d at 720 (quoting *Johnson v. Barnhart*, 449 F.3d 804, 805 (7th Cir. 2006)); *see Punzio v. Astrue*, 630 F.3d 704, 712 (7th Cir. 2011) ("The claimant bears the burden of submitting medical evidence establishing her impairments and her residual functional capacity.")

ALJs should examine the entire case record when considering the intensity, persistence, and limiting effects of an individual's symptoms. SSR 16-3p, 2016 WL 1119029, at *4 (Mar. 16, 2016). This includes the objective medical evidence, the individual's statements, information provided by medical sources, and any other relevant information in the individual's case record. *Id.* But not every factor is relevant in every case: An ALJ need only discuss those factors that are "pertinent to the evidence of record." *Id.* An ALJ may also consider the frequency of the claimant's complaints, the frequency of the claimant's attempts to receive treatment, and, if the claimant did not seek treatment, then why not. *Id.* Ultimately, "[t]he determination or decision must contain specific reasons for the weight given to the individual's symptoms, be consistent with and supported by the evidence, and be clearly articulated so the individual and any subsequent reviewer can assess how the adjudicator evaluated the individual's symptoms." *Id.* It follows that an ALJ's failure to adequately explain a credibility finding by discussing specific reasons supported by the record is grounds for reversal. *Terry v. Astrue*, 380 F.3d 471, 477 (7th Cir. 2009).

Gaston argues that the ALJ's RFC assessment was flawed because it "fail[ed] to address most of the SSR 16-3p factors." (Gaston's Brief at 12). For example, she says that the ALJ did not consider her statement that her level was pain was a seven out of 10. (*Id.*). She also says that her "excellent work history and reason for leaving work was not discussed in the ALJ decision." (*Id.* at 13). Next, she asserts that the ALJ did not account for her "activities of daily living" suggesting

that she has to take "breaks during housework," that "[s]he only takes a shower when her husband is home because of a fall risk," that she needs help from her husband to get dressed and off the toilet, and that she cannot enjoy the same activities that she used to—like crocheting—because of her impairments. (*Id.*). Finally, Gaston claims that the ALJ erred by questioning her motives and accusing her "of drug seeking behavior": "There is no citation for the record [sic] for the statement, 'Instead she wanted to be placed back on pain management—she wanted to 'stick to medications'—'mostly because she [was] interested in getting disability and she needed an assessment from a pain management specialist to support her claim.'" (*Id.* at 14) (citing Tr. at 27). The Court disagrees.

Like before, the ALJ's evaluation of Gaston's subjective symptoms was not patently wrong. First, contrary to Gaston's claim, the ALJ explicitly acknowledged in the RFC assessment that Gaston thought her pain was around a seven out of ten and that she claimed only being able to stand or sit for about 20 minutes at a times. He also recognized Gaston's suggestion that her pain had lasted about 10 years, with the sciatica lasting three. What's more, the ALJ pointed to Gaston's cane usage, her supposed need to move constantly to find a comfortable position, and her statements about having to lie down every afternoon for two-to-three hours. While the ALJ did not address Gaston's claims about needing support from her husband and son, the RFC assessment still shows that the ALJ was aware of and considered the extent of Gaston's subjective impressions. More importantly, a claimant's statements are just one of several factors used to assess the intensity, persistence, and limiting effects of an individual's symptoms. Similarly, while a "claimant with a good work record is entitled to substantial credibility when claiming an inability to work because of a disability," *Hill v. Colvin*, 807 F.3d 862, 868 (7th Cir. 2015), "work history is just one factor among many, and is not dispositive," *Loveless v. Colvin*, 810 F.3d 502, 508

(7th Cir. 2016). The ALJ here considered Gaston's subjective impressions and contrasted them with Dr. Vyas's finding that Gaston only had mild difficulty getting on and off the examination table, that she could walk without a cane, and that her range of motion and motor strength were normal. Likewise, Nurse Miller said that Gaston's overall condition was good and that she was not in acute distress. Even so, the ALJ still gave Gaston's testimony credit because the record as a whole reflected that she showed some instability and sciatica and thus should be limited to sedentary work without the use of foot petals. And while Gaston says the ALJ wrongfully accused her of being a drug-seeker, the ALJ was justified in noting Gaston's own statements to Dr. Selby that she preferred to "stick to medications" and get treated by Fairfield Pain Management "because she is interested in getting disability and needs their assessment." These statements—contrary to Gaston's brief—were cited by the ALJ and are in the record. For all that, the ALJ noted that this apparent inconsistent was "certainly not dispositive." Rather, the ALJ's decision to discount Gaston's subjective impressions was based on a thorough review of the treatment records, the medical opinions, and the hearing testimony.

### C. ALJ's Evaluation of Gaston's Obesity in the RFC Assessment

In making an RFC assessment, ALJs should generally assess "the effect obesity has upon [an] individual's ability to perform routine movement and necessary physical activity within the work environment." SSR 02-01P, 2002 WL 34686281, at *6 (Sept. 12, 2002). For example, "fatigue may affect the individual's physical and mental ability to sustain work activity." *Id.* "But failure to explicitly consider the effect of obesity may be harmless error." *Prochaska v. Barnhart*, 454 F.3d 731, 736 (7th Cir. 2006). In *Skarbek v. Barnhart*, for example, the Seventh Circuit upheld an ALJ's denial of benefits—even though he did not explicitly consider the claimant's obesity—because obesity was factored *indirectly* into the decision as part of the reviewing doctors' opinions.

390 F.3d 500, 504 (7th Cir. 2004). The Seventh Circuit considered a similar question in *Pepper v. Colvin*, 712 F.3d 351, 364 (7th Cir. 2013). The ALJ in that case found that the claimant's obesity was a severe impairment but did not specifically "discuss 'any functional limitations resulting from the obesity' when formulating his RFC assessment." *Id.* (quoting SSR 02-01, 2002 WL 34686281, at *7). There too, the Seventh Circuit affirmed because the RFC was "based on limitations identified by doctors who specifically noted obesity as a contributing factor to the exacerbation of other impairments." *See id.* at 364–65.

Gaston argues that the ALJ erred by not explicitly discussing her obesity in the RFC assessment. She states that that she "is 5'8 and 227 pounds with a body mass index of 34.5" and "has lumbar disc disease" that exacerbates her musculoskeletal impairments. (Gaston's Brief at 17). She further claims that the ALJ never recognized her condition in Steps Two through Five. (*Id.*). But the ALJ did, in fact, acknowledge that obesity is among Gaston's severe impairments at Step Two. (Tr. at 19). Similarly, the ALJ noted at Step Three that Gaston "is 5'8" tall," weighs 239 pounds, and had a body mass index "ranging from 33.75 to 36.34 kg/m$^2$." (*Id.* at 22). He then acknowledged that "obesity can cause limitations in an individual's ability to function and, consequently, . . . factored [Gaston's] obesity into her [RFC]." (*Id.*). And even though the RFC assessment did not specifically address Gaston's obesity, the medical opinions that the ALJ relied on *did*. For example, Dr. Vyas noted upon examination that Gaston was 5'8" and weighed 227.6 pounds. (*Id.* at 485). He also observed that Gaston "walked holding cane in her right hand" though "[s]he could walk without that too." (*Id.* at 486). Nurse Miller also reported that Gaston's height, weight, and body mass index. (*Id.* at 291). In short, there is no doubt that the reviewing medical examiners were aware of Gaston's obesity and considered it in their assessments. Moreover, Gaston's claim that the ALJ did not consider her testimony that she lies down every day for two

hours is not true—the ALJ noted that fact in the RFC. (*Id.* at 23). And the ALJ ultimately found that the intensity, persistence, and limiting effects of Gaston's symptoms were inconsistent with the medical evidence and other evidence in the records. As discussed, that finding was supported with substantial evidence and not patently wrong.

###       III.     CONCLUSION

The Court **AFFIRMS** the Commissioner's denial of benefits and **DIRECTS** the Clerk of Court to **ENTER JUDGMENT**.

**IT IS SO ORDERED.**

**Dated: Tuesday, July 27, 2021**

<u>S/J. Phil Gilbert</u>
**J. PHIL GILBERT**
**UNITED STATES DISTRICT JUDGE**
